FILED
2021 Feb-23  PM 04:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER WORKS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| | } | |
| | } | |
| **v.** | } | **Case No.:  4:19-cv-01515-MHH** |
| | } | |
| | } | |
| **ANDREW SAUL, Commissioner of the Social Security Administration,** | | |
| | | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

Christopher Works has asked the Court to review a final decision of the Commissioner of Social Security in which the Commissioner denied his application for supplemental security income, also known as SSI benefits.  For the reasons below, the Court remands this matter to the Commissioner for additional administrative proceedings.

1

**Procedural Background**

Mr. Works applied for supplemental security income in July 2017. (Doc. 7-3, p. 18; Doc. 7-6, p. 2).[1]  On October 3, 2017, the Commissioner denied Mr. Works's application and explained that if Mr. Works wished to challenge the unfavorable determination, within 60 days he must request a hearing from an administrative law judge. (Doc. 7-5, p. 2).

Mr. Works requested a hearing before an ALJ on November 16, 2017, and the hearing took place on January 17, 2019. (Doc. 7-3, p. 33; Doc. 7-5, p. 9).  The ALJ issued an unfavorable decision on March 1, 2019. (Doc. 7-3, p. 15).  On July 18, 2019, the Appeals Council denied Mr. Works's request for review, (Doc. 7-3, pp. 2–7), making the Commissioner's decision final and a proper subject of this Court's judicial review. *See* 42 U.S.C. § 405(g).

**Standard of Review**

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

---

[1] Mr. Works has applied for SSI benefits several times before. (Doc. 7-7, pp. 2-3).

A district court must determine whether there is substantial evidence in the record to support the ALJ's findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If the ALJ's decision is supported by substantial evidence, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

**The Regulatory Framework for Applications Filed after March 27, 2017**

The general rules guiding an ALJ's analysis of an application for SSI benefits are well-settled. To be eligible for SSI benefits, a claimant must be disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin*, 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)). To determine if a claimant is disabled, an ALJ follows a five-step sequential evaluation process:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136–37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

The regulations governing the types of evidence that a claimant may present in support of his application for benefits or that the Commissioner may obtain concerning an application and the way in which the Commissioner must assess that evidence changed in March of 2017, and those changes apply to this case because Mr. Works filed his application for benefits in July of 2017.  Under the new regulations, evidence falls into five categories:  objective medical evidence, including laboratory findings; medical opinions, meaning "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions;" "other medical evidence" which includes all non-objective medical evidence such as medical history, diagnoses, and "judgments about the nature and severity of your impairments;" evidence from non-medical sources such as family members, employers, or others who have information relevant to an application for benefits; and prior administrative medical findings, which are findings, "other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see [20 C.F.R.] § 416.1400) in your current claim based on their review of the evidence in your case record . . . ."  20 C.F.R. § 416.913(a).

The new regulations govern the way in which an ALJ must evaluate medical opinions and prior administrative medical findings from federal and state agency

medical and psychological consultants.  Now, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's own] medical sources."  20 C.F.R. § 416.920c(a).  Instead, an ALJ must evaluate each medical opinion using the following five factors:

(1) **Supportability.** The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) **Consistency.** The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

(3) **Relationship with the claimant.** This factor combines consideration of the issues in paragraphs (c)(3)(i)-(v) of this section.

i. Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

ii. Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s).

iii. Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s).

iv. Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help

6

> demonstrate the level of knowledge the medical source has of your impairment(s).
>
> v.   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder.
>
> (4) **Specialization.** The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.
>
> (5) **Other factors.** We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding. This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. When we consider a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive.

20 C.F.R. § 416.920c(c)(1)-(5) (emphasis added).    When considering the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1).  And when considering the consistency of a medical opinion, "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical

sources in the claim, the more persuasive the medical opinion[] . . . will be."  20

C.F.R. § 416.920c(c)(2).

In his written decision, an ALJ must state the extent to which he found the

medical opinions and prior administrative medical findings in the record persuasive,

using the following criteria:

(1) **Source-Level Articulation.**  Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record.  Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) **Most Important Factors.**  The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be.  Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) **Equally Persuasive Medical Opinions or Prior Administrative Medical Findings About the Same Issue.** When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3) (emphasis added).

The new regulations do not address the way in which an ALJ should weigh other evidence including diagnoses that do not include opinions concerning impairment-related limitations or restrictions, objective medical evidence such as test results, and testimony provided during administrative hearings.[2] The regulations state that an ALJ does not have to explain how he considered evidence from non-medical sources using the standards in 20 C.F.R. § 416.920c(a), (b), and (c). 20 C.F.R. § 416.920c(d).[3] An ALJ still must follow 20 C.F.R. § 416.929 and SSR 16-3p to evaluate of a claimant's reported symptoms and pain.

---

[2] The parties do not cite to, and the Court has not identified, controlling regulations in this area.

[3] *See Rochelle S. v. Saul*, No. C20-5532-MAT, 2021 WL 252925, at *3 (W.D. Wash. Jan. 25, 2021) ("Under the regulations the ALJ cited, [§ 416.920c(d)] she was 'not required to articulate how [she] considered evidence from nonmedical sources using the requirements' for medical sources, such as supportability, consistency, and treating relationship."); *Melanie Lynne H. v. Saul*, No. 20-1028-JWL, 2020 WL 6262913, at *6 (D. Kan. Oct. 23, 2020); *Wright v. Comm'r of Soc. Sec.*, No. 2:19-cv-1124, 2020 WL 5651540, at *6 (S.D. Ohio Sept. 23, 2020); *Simone V. v. Saul*, No. 19-2577-JWL, 2020 WL 5203461, at *4 (D. Kan. Sept. 1, 2020); *Ryan L. F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *8 (D. Or. Dec. 2, 2019) ("Although the ALJ must consider evidence from nonmedical sources pursuant to [20 C.F.R.] §§ 404.1520c(d) and 416.920c(d) of the new regulations, the ALJ is 'not required to articulate how [he] consider[s]

**The ALJ's Findings**

The ALJ found that Mr. Works had not engaged in substantial gainful activity since July 24, 2017, the day Mr. Works applied for benefits. (Doc. 7-3, p. 20). In his application for benefits, Mr. Works identified his disabling conditions as "left side of body/broken foot," "no education," and "mental." (Doc. 7-6, p. 2; Doc. 7-7, p. 7). The ALJ determined Mr. Works suffered from the following severe impairments: drug use, alcohol use disorder, borderline intellectual functioning, and remote fracture of the left foot. (Doc. 7-3, p. 20). He found that Mr. Works also had non-severe impairments of post-traumatic stress disorder and psychotic disorder. (Doc. 7-3, p. 20).

The ALJ determined that Mr. Works's "medically determinable impairments could reasonably be expected to cause" some of the symptoms Mr. Works alleged, but Mr. Works's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (Doc. 7-3, p. 22). He determined Mr. Works did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Doc. 7-3, p. 20). The ALJ considered whether Mr. Works's mental

---

evidence from nonmedical sources' and he . . . does not have to use the same criteria as required for medical sources.").

impairments, singly and in combination, met or medically equaled the criterial of listings 12.02, 12.03, 12.04, and 12.09, and concluded they did not.  (Doc. 7-3, p. 20).

The ALJ determined that Mr. Works had the residual functional capacity to perform medium work as defined in 20 C.F.R. § 416.967(c) subject to the following limitations:

> Can never use foot controls with lower left extremity.  Can never climb ladders, ropes or scaffolds.  Can never be exposed to workplace hazards such as moving mechanical parts and high, exposed places.  Limited to simple and routine tasks but not at a production rate pace.  Has the ability to make simple work-related decisions, and can tolerate occasional changes in the work setting.  Can tolerate occasional interaction with the public, and occasional interaction with coworkers.  Can accept instructions and respond appropriately to supervisors, where this interaction occurs occasionally throughout the workday.

(Doc. 7-3, p. 21).  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work . . . he . . . can also do sedentary and light work."  20 C.F.R. § 416.967(c).[4]  The ALJ "considered all symptoms and the extent to which these

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).

"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out the job duties."  20 C.F.R. § 416.967(a).

symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 316.929," as well as "the medical opinion(s) and prior administrative finding(s) in accordance with the requirements of 20 CFR 416.920c." (Doc. 7-3, p. 22). The ALJ cited several x-rays taken during healthcare visits beginning in 2011 to support his decision that Mr. Works had "no acute fracture or abnormalities" in his left foot. (Doc. 7-3, p. 23). He concluded that Mr. Works could "ambulate without an assistive device" and that Mr. Works "exhibited full range of motion in all extremities." (Doc. 7-3, p. 26).

The ALJ also determined that Mr. Works's "psychological symptoms are controlled with minimal outpatient treatment and limited medication" and that Mr. Works could "meet the basic demands of unskilled work." (Doc. 7-3, p. 25). And "[b]y his own report, [Mr. Works] can take care of personal needs without difficulty." (Doc. 7-3, p. 26). The ALJ noted that while Mr. Works "has a history of substance abuse, it is not material to this decision. He denied recent drug abuse, nor is there evidence that his history of using drugs has been more than a minimal effect on his ability to do basic work activities. Therefore, drugs and/or alcohol are not material to this decision." (Doc. 7-3, p. 25).

Relying on testimony from a vocational expert, the ALJ determined that jobs exist in the national economy for an individual of Mr. Works's age, education, work experience, and residual functional capacity. (Doc. 7-3, p. 26). Based on this

evidence, the ALJ concluded Mr. Works was not disabled and not entitled to benefits.  (Doc. 7-3, p. 27).

## The Evidence

### *Objective Medical Evidence and Other Medical Evidence*

In 2011, Mr. Works was seen several times by doctors at Quality of Life Health Services, Inc.  (Doc. 7-9, pp. 2–5, 6–9, 10–12, 13–15).  During his March 9, 2011 visit, Mr. Works complained of pain in his left foot and his left hip.  (Doc. 7-9, p. 2).  The record show that Mr. Works:

> Had L foot surgery by Dr. Kendra Dec of 2009 for a broken foot after falling off a horse.  Was discharged in March 2010, patient says the L foot hurts every now and then.  He takes Tylenol for pain.  Hurts worse at night and when he puts weight on it.  No swelling on exam.  ROM of the ankles are normal.  Tenderness on the arch of the foot. experiences shooting pains from heel to back of the leg.

(Doc. 7-9, p. 2).  Dr. Flores noted the presence of "[t]wo linear scars . . . on the top of the L foot.  No swelling."  (Doc. 7-9, p. 4).

Mr. Works's April 13, 2011 appointment concerned "[n]umbness in both hands, from the wrist to the tips of the fingers, x 2 weeks.  Numb all day.  Will do fasting blood work tomorrow.  Ultram helps with the foot pain, may take tylenol with it.  Resend to hospital for xray of the L foot and ankle."  (Doc. 7-9, p. 6; *see also* Doc. 7-9, p. 9).[5]  On July 1, 2011, Mr. Works presented with "L foot pain and

---

[5] ULTRAM, DRUGS.COM, https://www.drugs.com/ultram.html (last visited Nov. 2, 2020) ("Ultram (tramadol) is a narcotic-like pain reliever . . . [u]sed to treat moderate to severe pain.").

some numbness in both distal upper extremities." (Doc. 7-9, p. 10). Dr. Flores wrote that Mr. Works's labs were "essentially normal" and that Mr. Works "[w]ill continue w/Ultram as it helps. He takes it with tylenol. Will try Neurontin." (Doc. 7-9, p. 10).[6] Dr. Flores characterized Mr. Works's limb pain as "Chronic." (Doc. 7-9, p. 12). On October 27, 2011, Dr. Flores treated Mr. Works for left foot pain, made worse by standing. (Doc. 7-9, p. 13). Dr. Flores noted that Mr. Works's x-rays were normal and that "Tramadol has been ineffective." (Doc. 7-9, p. 13). Dr. Flores prescribed Celebrex, Neurontin, and Ultram. (Doc. 7-9, p. 14).[7]

Mr. Works also received treatment in 2011 from Dr. McAllister at the Marshall Medical Center-South emergency room. (Doc. 7-8, pp. 72–73). On April 25, 2011, doctors ordered x-rays of Mr. Works's left foot and left ankle. (Doc. 7-8, pp. 72–73). The left foot x-ray showed "[m]ultiple surgical screws . . . in the tarsometatarsal region," and "no evidence of acute fracture or destructive osseous pathology." (Doc. 7-8, p. 72). The left ankle x-ray showed "no evidence of acute

---

[6] NEURONTIN, DRUGS.COM, https://www.drugs.com/neurontin.html (last visited Nov. 2, 2020) ("Neurontin (gabapentin) is an anti-epileptic drug, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain. Neurontin is used in adults to treat neuropathic pain (nerve pain) . . . .")

[7] CELECOXIB (CELEBREX), JOHNS HOPKINS ARTHRITIS CENTER, https://www.hopkinsarthritis.org/patient-corner/drug-information/celecoxib-celebrex/ (last visited Feb. 10, 2021) ("Celecoxib is common known by the brand name Celebrex. Celecoxib . . . is used to relieve some symptoms caused by arthritis, such as inflammation, swelling, stiffness, and joint pain.").

fracture, dislocation or destructive osseous pathology," and [t]he articular relationships are intact." (Doc. 7-8, p. 73).

On October 10, 2012, Mr. Works returned to Quality of Life complaining of continued pain in his left foot. (Doc. 7-9, p. 16). He reported the pain began about three weeks before his visit and "occurs constantly and is stable." (Doc. 7-9, p. 16). The pain was "aching and throbbing" and "is aggravated by bending and movement." (Doc. 7-9, p. 16). Mr. Works's physical exam revealed lumbar spine tenderness and moderately reduced range of motion in addition to left foot pain. (Doc. 7-9, p. 19). Dr. McCain prescribed Flexeril for back pain and ordered x-rays of his back. (Doc. 7-9, p. 19). Mr. Works's records also show that he presented with "anxious/fearful thoughts, depressed mood and fatigue but denies hallucinations or poor judgment." (Doc. 7-9, p. 16). Dr. McCain characterized Mr. Works's depression as "Chronic," and prescribed Cymbalata. (Doc. 7-9, p. 19).[8]

In April 2014, Mr. Works saw Dr. Hossam at the Riverview Regional Medical Center emergency room for acute low back pain. The ER record states: "The patient

---

[8] FLEXERIL, DRUGS.COM, https://www.drugs.com/flexeril.html (last visited Feb. 10, 2021) ("Flexeril (cyclobenzaprine) is a muscle relaxant. It works by blocking nerve impulses (or pain sensations) that are sent to your brain.").

CYMBALTA, DRUGS.COM, https://www.drugs.com/cymbalta.html (last visited Feb. 10, 2021) ("Cymbalta (duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor antidepressant (SSNRI). Duloxetine affects chemicals in the brain that may be unbalanced in people with depression. Cymbalta is used to treat major depressive disorder in adults. It is also used to treat general anxiety disorder in adults . . . .").

has not experienced similar symptoms in the past.  The patient has not recently seen a physician.  Pt lifted a heavy stack at work 2 days ago felt something popped in his back . . ."  (Doc. 7-8, p. 44).  Dr. Hossam prescribed Mobic and Flexeril and gave Mr. Works a work release form.  (Doc. 7-8, pp. 43-47).[9]

On August 15, 2014, Mr. Works returned to the Marshall Medical Center ER complaining of a left leg injury.  (Doc. 7-8, p. 22; Doc. 7-8, pp. 36-37).[10]  He "complain[ed] of pain on weight bearing" and had swelling, but no "tingling, weakness, numbness, suspected foreign body or skin laceration."  (Doc. 7-8, p. 22).  The ER doctor ordered x-rays, which showed "no evidence for fracture or dislocation" and "[n]o acute bony abnormality of the left lower leg."  (Doc. 7-8, p. 21).  The "clinical impression" noted a "[s]ingle superficial puncture wound to the left lower leg," a "[c]ontusion to the left lower leg," and Mr. Works's report that he was in an "[o]ff-road vehicle accident . . . ."  (Doc. 7-8, p. 23).  Mr. Works claimed the four-wheeler ran over his leg.  (Doc. 7-8, p. 22).  The doctor instructed Mr.

---

[9] MOBIC, DRUGS.COM, https://www.drugs.com/mobic.html (last visited Feb. 10, 2021) ("Mobic (meloxicam) is a nonsteroidal anti-inflammatory drug (NSAID).  Meloxicam works by reducing hormones that cause inflammation and pain in the body.  Mobic is used to treat pain or inflammation caused by rheumatoid arthritis and osteoarthritis in adults.").

[10] Mr. Works visited the Marshall Medical Center ER in January 2014 for treatment of a respiratory infection.  (Doc. 7-8, pp. 12-21).  The records are relevant only to the extent that they indicate that Mr. Works sought emergency room treatment for routine illness, likely because he did not have insurance.

Works to use crutches and not to put weight on his leg for seven days.  (Doc. 7-8, p.

26).

On October 28, 2014, Dr. June Nichols, a Gadsden Psychological Services

psychologist, conducted a "Disability Determination Comprehensive Evaluation" of

Mr. Works. (Doc. 7-8, p. 2).  The first section, labeled "Present Illness" described

Mr. Works's current medical problems:

> Mr. Works reported that he began having problems with depression
> when he was a child.  "It was a different world when we grew up.  At
> two years of age he was smoking and drinking and it was funny to the
> family.  "But I had a car wreck and got messed up." "I have taken
> charges for things where they had nothing on me, but pressured me to
> plead guilty.  They waited five years to charge me and I had no money
> to bond out and so I plead to get out of jail when I was 17."  Mr. Works
> has never been hospitalized due to any mental or emotional issues.  He
> has never been involved in counseling.  He was prescribed Cymbalta
> and he had a severe allergic reaction.  He has been diagnosed with
> depression.  He reported that he has tried to get into mental health, "But
> they keep rescheduling."  He was finally able to get in last week.  He is
> status post surgery to rebuild his left foot.  The horse fell on my left
> foot and they pulled my foot out of the stirrup and had to straighten it
> up to take me to the hospital."  He broke his pelvis in two places when
> he was thrown through a T-top in an auto accident at 16.  He reported
> that he has knocked his left kneecap out of place several times, broken
> his left ankle twice since the accident and the screws are working out,
> he had a four-wheeler accident and the peg had gone into his ankle.  "I
> knocked a deep fat fryer over and got fourth degree burns on my let
> ankle."  He broke a couple of ribs, his collarbone and his 'pinky' on his
> right hand.  At the age of 15 he got 10 teeth kicked out of the left side
> of his mouth by a horse.  He suffered a cracked skull in two places and
> was in a coma for a month as a result of the accident of 16.

(Doc. 7-8, p. 2).  Mr. Works reported to Dr. Nichols that he reads words backwards.

(Doc. 7-8, p. 2).  He explained he had worked for short periods of time for National

Incinerators, for the railroad, and in construction.  (Doc. 7-8, p. 3).[11]  He lived by himself in a trailer on his mother's property without electricity or water and would go to his mother's house when he needed something.  (Doc. 7-8, pp. 3-4).  He had no friends.  (Doc. 7-8, p. 4).  Mr. Works reported that he was 5' 2" tall and weighed 222 pounds.  His eye contact was poor.  (Doc. 7-8, p. 3).

Dr. Nichols described Mr. Works's mood as "depressed and congruent with processes" and his affect as "restricted."  (Doc. 7-8, p. 3).  Mr. Works was "oriented to person, place, time and situation."  (Doc. 7-8, p. 4).  But his "[s]peed of mental processing was poor.  He was able to count from 20 to 1 in 33 seconds.  He was unable to perform Serial Threes or Serial Sevens.  He was unable to spell backward. (dlorw) [*sic*] He was able to perform addition and subtraction, but not the more complex arithmetic involving multiplication."  (Doc. 7-8, p. 4).  Mr. Works's recent memory and remote functions were "grossly intact."  (Doc. 7-8, p. 4).  His "[t]hought processes were slow.  There was no evidence of confusion, loose associations, tangentiality, flight of ideas, or thought blocking."  (Doc. 7-8, p. 4).  Dr. Nichols concluded Mr. Works "was estimated to be functioning in the Borderline range of intellectual ability."  (Doc. 7-8, p. 4).

---

[11] In 2017, Mr. Works reported the same employment history to Dr. Kennon.  (Doc. 7-8, p. 50). Mr. Works told Dr. Iyer that he "last worked in 2014 packing shingles."  (Doc. 7-8, p. 55).

Dr. Nichols diagnosed Mr. Works with Major Depressive Disorder, Recurrent, Severe; Impulse control Disorder; Alcohol Dependence; and Borderline Intelligence. (Doc. 7-8, p. 5). Dr. Nichols noted Mr. Works had "Problems with access to medical care" and "Occupational problems." (Doc. 7-8, p. 5). Dr. Nichols assigned Mr. Works a GAF score of 45. (Doc. 7-8, p. 5).

Before Dr. Nichols rendered her opinion, she reviewed the medical evidence DDS provided, and she considered that information in her assessment of Mr. Works. (Doc. 7-8, p. 5). Dr. Nichols's report included the following summation:

> The medical evidence of record provided by DDS were reviewed and those findings were considered in the overall assessment of the patient. Mr. Works suffers symptoms of depression that have likely been there for some time. He has been drinking alcohol, admittedly to access [*sic*], since before the age of five. He demonstrates problems with impulse control that are likely related to both the way that he was raised and complicated by his closed head injury result from an MVA at the age of 16. His ability to relate interpersonally and withstand the pressures of everyday work is compromised due to the nature of his current symptoms. He does have deficits, which would interfere with his ability to remember, understand and carry out work related instructions. The anxiety would markedly interfere with concentration, persistence and pace and tends to increase when he is around people. He is able to handle his own funds and to live independently with assistance.

(Doc. 7-8, p. 5).

During the fall and winter of 2014, Mr. Works received mental health treatment at C.E.D. Mental Health Center. (Doc. 7-8, pp. 8, 60–71; Doc. 7-9, p. 25). Mr. Works received treatment on September 3, October 15, November 11, and December 15, 2014. (Doc. 7-8, pp. 8, 60–71; Doc. 7-9, p. 25). Mr. Works's

presenting complaint/reason for referral was that his "moods change quickly, [he is] impulsive, easily agitated and angered – stays to himself 'doesn't like people.' Family concerned about him.  Had head injury (mva) at age 16.  No prior mental health services."  (Doc. 7-8, p. 60).

His intake form identifies as "significant problems" anger, mood swings, "depressed at times," audio hallucinations, and avoiding social contact.  (Doc. 7-8, p. 67).  The form shows Mr. Works dropped out of school after sixth grade, he was in special education while he attended school, and he had a low literacy level.  (Doc. 7-8, pp. 62-63, 68; *see also* Doc. 7-8, p. 3).  The treatment notes show a diagnosis of "Bi Polar I Disorder, Most Recent Episode Manic, Severe with Psychotic Features."  (Doc. 7-8, pp. 8, 71; *see also* Doc. 7-9, p. 25).  Mr. Works was assigned a GAF score of 45.  (Doc. 7-8, p. 8).[12]  Mr. Works's intake sheet contains this

---

[12] "The GAF is a standard measurement of an individual's overall functioning 'with respect only to psychological, social, and occupational functioning' using a 1 to 100-point scale. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32-33 (4th ed. 2000) ('DSM-IV'). According to the DSM-IV, a GAF rating in the range of 41-50 indicates that the person has either serious symptoms—such as suicidal ideation or severe obsessional rituals—or a serious impairment in social, occupational, or school functioning—such as no friends or an inability to keep a job.

The more recent edition of the DSM, however, abandoned the use of GAF scoring, noting 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.' American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) (DSM-V). After the DSM-V was published, the Social Security Administration issued a directive to its ALJs instructing them to consider GAF scores as medical opinion evidence but emphasizing that a claimant's GAF scores should not be considered in isolation. The directive stated:

    The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence, a GAF needs supporting evidence to be

notation:  "please note antidepressant to which he is allergic."  (Doc. 7-8, p. 60).[13]

He had no insurance and was unemployed.  (Doc. 7-8, p. 64).  Mr. Works was 5' 3"

tall and weighed 215 pounds.  (Doc. 7-8, p. 70).

In December 2015, Dr. Kitchens at Marshall Medical Center's ER ordered x-

rays of Mr. Works's right elbow a few days after Mr. Works injured it while

chopping wood.  Mr. Works's elbow was swollen, but his x-rays were unremarkable.

Mr. Works reported consuming a 12-pack of beer daily.  At discharge, he was given

a work note.  (Doc. 7-8, pp. 28-35).

Mr. Works went to the Riverview Regional Medical Center ER for ankle pain

on October 18, 2016.  (Doc. 7-8, p. 39).  He reported the pain began when he stepped

in a hole earlier that day.  (Doc. 7-8, p. 39).  X-rays of Mr. Works's left ankle showed

"[e]xtensive postsurgical changes . . . within the midfoot, and forefoot.  Osteopenia

also noted.  The ankle mortise appears intact and symmetric.  No significant soft

tissue swelling.  No obvious evidence for acute fracture, or dislocation seen."  (Doc.

---

given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.

Soc. Sec. Admin., Administrative Message 13066 (July 22, 2013)."  *Castro v. Acting Comm'r of Soc. Sec.*, 783 Fed. Appx. 948, 950 n.3 (11th Cir. 2019).

[13] During his administrative hearing, Mr. Works testified that he had an allergic reaction to his medication that made his throat swell closed.  Paramedics had to give him a shot to counter the reaction.  (Doc. 7-3, p. 49).

7-8, p. 41).[14]  X-rays of his left foot show "[e]xtensive postsurgical changes . . . at the tarsal metatarsal interface.  Osteopenia is noted.  The base of the fifth metatarsal is intact.  No obvious evidence for acute fracture, or dislocation is seen.  There does appear to be some soft tissue prominence about the midfoot which may potentially be chronic.  Correlate clinically."  (Doc. 7-8, p. 42).  Mr. Works was discharged and told to follow up with an orthopedist.  (Doc. 7-8, p. 40).

On July 3, 2018, Mr. Works's family took him to St. Vincent's St. Clair because he was "confused and 'did not know who [his daughter] or himself was'." (Doc. 7-9, p. 28).  His records indicate he was working for a cable company in Bessemer, Alabama and that he did not have insurance.  (Doc. 7-9, pp. 26-27).  Mr. Works's daughter told the physician that Mr. Works had worked outside all day, had walked away from a job in Bessemer, and called for a ride home from a gas station in Vestavia Hills.  (Doc. 7-9, pp. 27-28).[15]  Medical records describe Mr. Works as having an altered mental state.  (Doc. 7-9, p. 27).  After receiving saline fluids, Mr.

---

[14] Matthew Varcallo et al., OSTEOPENIA, NATIONAL CENTER FOR BIOTECHNICAL INFORMATION, U.S. NATIONAL LIBRARY OF MEDICINE, https://www.ncbi.nlm.nih.gov/books/NBK499878/ (last visited Nov. 2, 2020) ("Osteopenia is a clinical term used to describe a decrease in bone mineral density (BMD) below normal reference values, yet not low enough to meet the diagnostic criteria to be considered osteoporotic.").

[15] The Court takes judicial notice that Bessemer is 15 miles from Vestavia Hills.  FED. R. EVID. 201(b); *United States v. Chapman*, 692 Fed. Appx. 583, 584 (11th Cir. 2017) ("[C]ourts may take judicial notice of certain universally undisputed facts."); *Hubbard v. Comm'r of Soc. Sec.*, 348 Fed. Appx. 551, 553 n.1 (11th Cir. 2009) (courts may take judicial notice of facts in social security appeals).

Works improved, and the doctor told him to stay home from work and stay hydrated the next few days.  (Doc. 7-9, p. 30).  The doctor also told him "to stay away from the marijuana and methamphetamines noted in his system."  (Doc. 7-9, p. 31).  His discharge diagnoses noted "[a]cute renal injury; [d]rug use; [and] [h]eat exhaustion."  (Doc. 7-9, p. 38).

Just a few weeks later, on August 16, 2018, Huntsville Hospital ER records show Mr. Works presented for a psychiatric evaluation.  (Doc. 7-9, p. 53).  He reported auditory hallucinations and homicidal ideation and told the triage staff he "has been hallucinating for years" but it had been worse over the last two months. (Doc. 7-9, pp. 56-58).  Mr. Works told them he had seen a psychiatrist about three years earlier and was diagnosed with bipolar disorder.  (Doc. 7-9, p. 58).  His urine toxicology screen tested positive for amphetamines and marijuana.  (Doc. 7-9, pp. 59, 63).  Mr. Works was diagnosed with Bi-polar disorder, unspecified.  (Doc. 7-9, p. 61).

### Medical Opinions

The following medical sources provided opinions about what Mr. Works still could do despite his impairments and whether he had one or more impairment-related limitations or restrictions:  Drs. Kennon, Iyer, Blackmon, and Hogan.  Dr. Kennon, a psychologist, and Dr. Iyer, a physician, conducted one-time consultative

evaluations of Mr. Works.  Dr. Blackmon, a psychiatrist, and Dr. Hogan, a physician, were non-examining state consultants who reviewed Mr. Works's medical records.[16]

### Dr. Kennon's Evaluation

At the request of the Disability Determination Service, Dr. Martha Kennon evaluated Mr. Works in September 2017.  (Doc. 7-8, p. 50).  At the time of the evaluation, Mr. Works was living alone in a camper.  (Doc. 7-8, p. 50).  His weight was stable at 200 pounds.  (Doc. 7-8, p. 51).

Dr. Kennon listed Mr. Works's reason for filing a disability claim as "he can't hold a job because he gets mad and quits."  (Doc. 7-8, p. 50).  Dr. Kennon noted that Mr. Works reported being kicked in the head by horses, a car wreck when he was 16, and a two-month coma.  (Doc. 7-8, p. 50).  Dr. Kennon wrote that Mr. Works "[s]ays that if he is around people he gets mad" and that he avoids people.  (Doc. 7-8, p. 50).  Mr. Works stated that he was afraid of snakes and "everybody."  (Doc. 7-8, p. 50).  Mr. Works reported instances of mania, including "periods of time when he did not sleep for a day or two" and "one instance when he blew all of the money and his wife left him."  (Doc. 7-8, p. 51).  With respect to alcohol use, Mr. Works stated that he "Drinks as many as he can when he can.  Used to drink a case a

---

[16] Dr. Nichols evaluated Mr. Works in October 2014 as part of a "disability determination comprehensive evaluation."  Because Dr. Nichols's examination and evaluation occurred before Mr. Works's alleged onset date of January 14, 2017, (*see* Doc. 7-3, p. 18), the Court does not view Dr. Nichols's opinion as a "medical opinion" as defined by 20 C.F.R. § 416.913(2) and discusses her evaluation above.

weekend." (Doc. 7-8, p. 51).[17]   He reported homicidal ideation and auditory hallucinations "[a]ll the time." (Doc. 7-8, p. 52).

Dr. Kennon described Mr. Works's level of intellectual functioning as "below average." (Doc. 7-8, p. 52). Mr. Works scored a 0/3 on "paired objects" and a 2/3 on "proverbs" in the "abstract thinking" portion of the evaluation. (Doc. 7-8, p. 52). Mr. Works "declined serial sevens and made multiple errors on serial threes. He is not able to perform most simple arithmetic calculations without error." (Doc. 7-8, p. 52). He was able to spell WORLD backwards. (Doc. 7-8, p. 52).

Before rendering her opinion, Dr. Kennon reviewed the medical evidence DDS provided. (Doc. 7-8, p. 52). Dr. Kennon diagnosed Mr. Works with PTSD and alcohol use disorder, moderate. (Doc. 7-8, p. 53). She concluded Mr. Works could not make work decisions or manage his own funds. (Doc. 7-8, pp. 52, 53). She reported that Mr. Works:

> is able to understand and carry out, but may not remember instructions. He is not able to sustain concentration and persist in a work related activity at a reasonable pace. He is likely not able to maintain effective social interaction on a consistent and independent basis with supervisors, co-workers, and the public. He is likely not able to deal with normal pressures in a competitive work setting.

---

[17] Mr. Works's father is an alcoholic. (Doc. 7-8, p. 51). His uncle, with whom he lived for several years when he was young, began offering Mr. Works alcohol when he was two years old. (Doc. 7-8, pp. 2-3).

(Doc. 7-8, p. 53).  Dr. Kennon recommended that Mr. Works see a neurologist "to assess for temporal lobe epilepsy" and a psychiatrist "to assess need for psychotropic medication."  (Doc. 7-8, p. 53).

### Dr. Iyer's Evaluation

At the request of the Disability Determination Service, Dr. Anand Iyer examined Mr. Works in September 2017.  (Doc. 7-8, p. 55).  Mr. Works reported left ankle pain and mental issues to Dr. Iyer.  (Doc. 7-8, p. 55).  Dr. Iyer noted that Mr. Works "report[ed] an injury to his left ankle riding a horse 4-5 years ago and had surgery at the time.  He still has significant range of motion limitation of that ankle causing difficulty standing, walking, climbing steps, squatting, lifting, and carrying."  (Doc. 7-8, p. 55).  Mr. Works reported "depressed mood, insomnia, paranoia, and auditory hallucinations."  (Doc. 7-8, p. 55).  Dr. Iyer recorded that Mr. Works:

> ha[d] difficulty getting on and off the exam table.  Hand grip strength is 5/5 bilaterally.  Remainder of strength exam is 5/5 throughout. Muscles with no atrophy throughout.  Straight leg raise test is negative. Gait is abnormal as he walks with a limp favoring his right leg.  [Mr. Works] does not walk with an assistive device.  [Mr. Works] cannot walk on heels and tiptoes and cannot squat due to ankle pain.  [Mr. Works] has full range of motion of the neck, shoulders, back, elbows, wrists, hands, hips, knees, ankles, and feet.

(Doc. 7-8, p. 56).  In addition to taking Mr. Works's medical history and examining him, Dr. Iyer reviewed Mr. Works's medical records.  (Doc. 7-8, p. 56).

Dr. Iyer made two findings.  First, Mr. Works's history of left ankle pain was "likely secondary to post-traumatic degenerative joint disease, confirmed by records." (Doc. 7-8, p. 56).  Second, Mr. Works's history of auditory hallucinations was concerning for schizophrenia and warranted further evaluation.  (Doc. 7-8, p. 56).

Dr. Iyer concluded:  "In the current condition, [Mr. Works] may have some impairment of functions involving: standing, walking, climbing steps, bending, lifting, twisting, and carrying.  [Mr. Works] does not have significant limitation of functions involving: sitting, reaching overhead, handling, hearing, and speaking." (Doc. 7-8, p. 56).

**Dr. Blackmon's Assessment**

On September 14, 2017, Dr. Lee Blackmon prepared a non-exam consultative review of Mr. Works's medical records and disability claim.  (Doc. 7-4, pp. 2-10). Dr. Blackmon listed Mr. Works's weight as 200 pounds and his BMI as 32.3.[18]  Dr. Blackmon reviewed Drs. Iyer's, Kennon's and Nichols's consultative reports and medical records from CED Mental, Riverview Regional Medical Center, and Marshall Medical Center South.  (Doc. 7-4, pp. 3-5).

---

[18] The Centers for Disease Control and Prevention list a "normal" BMI as between 18.5 and 24.9, "overweight" as 25.0 to 29.9, and "obese" as 30.0 and above.  ABOUT ADULT BMI, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html (last visited Feb. 10, 2021).

Included in Dr. Blackmon's assessment are notes from disability adjudicator Andrica Haynes's August 25, 2017 telephone conversation with Mr. Works. (Doc. 7-4, p. 6). Mr. Works reported he wasn't sleeping much, but he could handle day-to-day tasks like personal care, cooking, laundry, and minor yardwork. (Doc. 7-4, p. 6). Mr. Works said he could pay attention for 30 minutes at a time, could walk 50 feet without rest, and had problems with lifting, squatting, bending, standing, sitting, stair climbing, completing tasks, memory, and kneeling. (Doc. 7-4, p. 6).

Dr. Blackmon prepared a "findings of fact and analysis of evidence." (Doc. 7-4, pp. 6-10). He noted that Mr. Works has a seventh-grade education. (Doc. 7-4, p. 6). He listed four impairments from which he believed Mr. Works suffered: the primary impairment of "Personality and Impulse-Control Disorders"; the secondary impairment of "Dysfunction – Major Joints"; and other impairments of "Depressive, Bipolar and Related Disorders" and "Neurodevelopmental Disorders." (Doc. 7-4, p. 9). He concluded Mr. Works "can drive/do simple tasks/get along with others when so motivated," and "when motivated [Mr. Works] can manage basic tasks, basic instxn, basic social interactions." (Doc. 7-4, p. 10). Dr. Blackmon believed that Mr. Works exaggerated his symptoms when he met with Dr. Kennon. (Doc. 7-4, p. 10). Dr. Blackmon also noted that Mr. Works did not seek consistent prescription medication treatment and did not use prescription medication that was provided to him. (Doc. 7-4, p. 10).

28

Dr. Blackmon concluded that Mr. Works had understanding and memory limitations.  (Doc. 7-4, p. 14).  Mr. Works's ability to remember locations and work-like procedures was "moderately limited" while his ability to understand and remember very short and simple instructions was not significantly limited.  (Doc. 7-4, p. 14).  Dr. Blackmon stated that Mr. Works "would learn and remember simple work instxns w/practice" and "could understand and remember simple instxn but not detailed ones."  (Doc. 7-4, p. 14).  Dr. Blackmon explained that Mr. Works "would benefit from a flexible schedule and would be expected to miss 1-2 days of work per month due to irritable mood.  [Mr. Works] would benefit from casual supervision. . . . [He] could tolerate ordinary work pressures but should avoid excessive workloads, quick decision making, rapid changes, and multiple demands."  (Doc. 7-4, p. 15).  Dr. Blackmon stated that Mr. Works's contact with the public "should be casual/nonintensive" and that feedback from supervisors should be supportive, tactful, and nonconfrontational.  (Doc. 7-4, p. 16).

### Dr. Hogan's Assessment

On October 3, 2017, Dr. Victoria Hogan prepared another portion of the non-evaluative consultative report on Mr. Works.  (Doc. 7-4, pp. 10-14).  She reviewed the opinions Drs. Kennon, Nichols, and Iyer provided, and she reviewed Mr. Works's October 2016 medical records from River Regional Medical.  (Doc. 7-4, pp. 11, 13).  Dr. Hogan found that Mr. Works could occasionally lift and/or carry 20

pounds and frequently lift and/or carry 10 pounds.  (Doc. 7-4, p. 12).  Dr. Hogan noted that Mr. Works had limitations, specifically that he was limited in his lower left extremity and that he should avoid frequent pushing or pulling with his lower left extremity.  (Doc. 7-4, p. 12).  Dr. Hogan found that Mr. Works could stand or walk for six hours during an eight-hour day.  (Doc. 7-4, p. 12).

While Dr. Hogan did not make a finding about Mr. Works's capacity to perform past relevant work, "the information is not material because potentially applicable Medical-Vocational Guidelines would direct a finding of 'not disabled' given the individual's age, education, and RFC.  Therefore, the individual can adjust to other work."  (Doc. 7-4, pp. 16-17).  Dr. Hogan concluded that "[b]ased on the seven strength factors of the physical RFC (lifting/carrying, standing, walking, sitting, pushing, and pulling)," Mr. Works had the maximum sustained work capability to perform light work.  (Doc. 7-4, p. 17).  Dr. Hogan recommended as representative occupations patcher, garment sorter, and marker.  (Doc. 7-4, p. 17).  These jobs are in the light or sedentary work categories.  *See* Dictionary of Occupational Titles Nos. 723.687-010 (patcher); 222.687-014 (garment sorter); and 209.587-034 (marker).

*Evidence from Non-Medical Sources*

On January 17, 2019, the ALJ held an administrative hearing on Mr. Works's application for benefits. (Doc. 7-3, p. 33). The ALJ asked Mr. Works if he thought there was anything he could do to make a living, and Mr. Works said he had tried but nobody would hire him because of his lack of education. (Doc. 7-3, pp. 38-39). Mr. Works explained he tried to get some work with his cousin who works in construction, but it did not work out because he does not get along well with others. (Doc. 7-3, p. 39). The ALJ recounted expenses that Mr. Works incurred for cigarettes, alcohol, and methamphetamine. (Doc. 7-3, p. 42). Mr. Works testified that he uses methamphetamine when he has a headache. (Doc. 7-3, p. 42). He explained that when his head hurts badly, he has auditory hallucinations. (Doc. 7-3, p. 43). Testimony from Mr. Works's ex-wife, who was not present when Mr. Works testified, substantiated Mr. Works's description of his hallucinations. (Doc. 7-3, pp. 53, 61).[19]

The ALJ asked Mr. Works about his two previous applications for benefits in 2011 and 2017. (Doc. 7-3, pp. 39-40). The 2011 decision revolved around Mr. Works's fractured foot, and the 2017 decision "was all about [his] mental issues." (Doc. 7-3, pp. 39-40). Much of the administrative hearing focused on Mr. Works's

---

[19] Ms. McDaniel's testimony was consistent with almost all of Mr. Works's testimony. (Doc. 7-3, pp. 53-61).

mental limitations.  Mr. Works stated that he did not get mental health care treatment because he could not make it to appointments.  (Doc. 7-3, p. 40).  Mr. Works reported that he did not have a primary care physician, and when he needed medical treatment, he would go to an emergency room to receive care.  (Doc. 7-3, p. 48).

Mr. Works testified that he was living with his ex-wife in the country in an old mobile home.  Most of Mr. Works's family was living nearby.  (Doc. 7-3, pp. 44-45).  A few months before his administrative hearing, Mr. Works had been jailed for domestic violence, and the charge was still pending at the time of his hearing. (Doc. 7-3, p. 48).  The charge pertained to Mr. Works's daughter.  (Doc. 7-3, pp. 49-50).

After Mr. Works and his ex-wife testified, the ALJ placed a vocational expert, Brenda Dumas, under oath and questioned her about Mr. Works's claim.  The ALJ posed the following hypothetical question to Ms. Dumas:

> Please assume a hypothetical person the same age, education as the claimant with the following limitations.  The person's capable of medium work, as defined in the regulations.  The person cannot use foot controls with the left lower extremity.  The person cannot climb ladders, ropes, and scaffolds; cannot be exposed to workplace hazards, such as moving, mechanical parts and high, exposed places.  The person's limited to simple, routine tasks, but not at a production-rate pace; has the ability to make simple, work-related decisions; can tolerate occasional changes in the work setting.  The person can tolerate occasional interaction with the public and with coworkers.  The person can accept instructions and respond appropriately to supervisors where the interaction occurs occasionally throughout the workday.  With those limitations, can you name some jobs in the national economy the person can perform?

(Doc. 7-3, p. 63).  Ms. Dumas said that yes, there were jobs such a person could perform, including a cleaner, a floor waxer, and a dish washer.  (Doc. 7-3, pp. 63-64).  Each of the three jobs Ms. Dumas listed required a work capacity of medium work.  (Doc. 7-3, pp. 63-64).  Ms. Dumas testified that if mental impairments caused the hypothetical person to miss four work days per month, or to be off task 20% or more of a normal work day, there would be no competitive work available.  (Doc. 7-3, p. 64).

Mr. Works's attorney asked Ms. Dumas several follow-up questions related to Mr. Works's mental impairments:

Q:   What level of absenteeism is tolerated at these jobs you've identified?

A:   In my professional opinion, approximately one day per month.

Q:   And what level of off-task behavior is tolerated at the jobs you've identified today?

A:   Again, in my professional opinion, approximately 10% of the workday.

Q:   If we have a hypothetical person of the claimant's age, education, and work experience, who is unable to interact with coworkers or supervisors, will there be any jobs that person could perform?

A:   No, ma'am.

Q:   If we have a hypothetical person of the claimant's age, education, and work experience, who is unable to understand, remember, or carry out even simple instructions, will there be jobs that that person can perform?

33

A:     No, ma'am.

(Doc. 7-3, pp. 64-65).

## Analysis

Mr. Works argues that the ALJ improperly rejected the opinions of an examining consultative physician and an examining consultative psychologist. (Doc. 9, p. 1).  Mr. Works also contends that the ALJ's decision is not based on substantial evidence.  (Doc. 9, p. 1).  The Court considers each argument in turn.

### *The ALJ's Evaluation of the One-Time Consulting Opinions*

Citing *McClurkin v. SSA*, 625 Fed. Appx. 960 (11th Cir. 2015), Mr. Works argues that the ALJ "failed to state with at least 'some measure of clarity' the grounds for his decision in repudiating the opinion of a treating physician."  (Doc. 9, pp. 16-17) (emphasis omitted).  Citing *Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995), he urges the Court to view "with a degree of suspicion" the ALJ's decision to find unpersuasive the opinions of Dr. Iyer and Dr. Kennon, the one-time examining consultants who saw Mr. Works in September of 2017.  (Doc. 9, p. 17). The Eleventh Circuit has not followed the *Wilder* decision, so neither will this district court.  (Doc. 9, p. 19) (quoting *Jackson v. Soc. Sec. Admin, Comm'r*, 779 Fed. Appx. 681, 685 (11th Cir. 2019)).  Mr. Works fairly points out that an ALJ must provide sufficient detail concerning the degree to which he finds a medical source's

opinion persuasive so that a reviewing court may understand the ALJ's analysis. (Doc. 9, pp. 16-17) (quoting *Winschel*, 631 F.3d at 1179).

Here, the ALJ stated generally that he "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 C.F.R. § 416.920c."   (Doc. 7-3, p. 22).   With respect to his analysis of the persuasiveness of the opinions of the two one-time consulting examiners, the ALJ explained:

> I find that Dr. Kennon's opinion is not persuasive.  He examined [Mr. Works] on one occasion.  His opinion was not adequately explained, and Dr. Kennon was not familiar with the other evidence in the claim. His opinion is inconsistent with [Mr. Works's] own functional statements at the hearing and elsewhere in the claim.  Finally, it appears that Dr. Kennon's is based almost entirely on subjective information obtained from the claimant at the one-time examination.

(Doc. 7-3, p. 25).[20]

> Dr. Iyer's opinion is also based on a one-time examination, and although it is somewhat consistent with the entire record it is only mildly persuasive.  Dr. Iyer's opinion is not adequately explained and is internally inconsistent.

(Doc. 7-3, p. 25).

The ALJ's analysis of the persuasiveness of Dr. Kennon's opinion may be adequate under the new regulations, but his explanation for why he found Dr. Iyer's

---

[20] Dr. Martha Kennon is a woman, not a man.  The record does not support the ALJ's assertion that Dr. Kennon "was not familiar with other evidence in the claim."  Dr. Kennon stated that she reviewed the medical evidence that the DDS provided to her.  (Doc. 7-8, p. 52).

opinion only "mildly persuasive" is not.  With respect to Dr. Iyer's opinion, the ALJ provided two-sentences in which he stated broad conclusions without explaining his analysis regarding consistency and supportability.  The Court does not believe an ALJ satisfies his obligation to "explain how we considered the supportability and consistency factors for a medical source's medical opinions" by stating only that a medical opinion "is somewhat consistent with the entire medical record."  Though 20 C.F.R. § 416.920c(b) recognizes that an ALJ cannot possibly articulate for each medical source how the ALJ considered all of the § 416.920c(c) factors, § 416.920c(b) requires more than a conclusory statement, at least with respect to the supportability and consistency factors so that a reviewing court can make a meaningful assessment of a challenge to an ALJ's evaluation of the persuasiveness of various medical opinions.

With respect to the ALJ's assessment of the opinion of Dr. Hogan, who did not examine Mr. Works, the ALJ did not state expressly whether he found her opinion persuasive.  The ALJ did state:  "Dr. Hogan's opinion is consistent with the entire record, including treatment and evaluations from all sources at the time of adjudication.   Dr. Hogan is familiar with our disability programs and their evidentiary requirements."  (Doc. 7-3, pp. 24-25).  The ALJ seems to have rested his evaluation of Dr. Hogan's opinion on the "Other Factors" prong of 20 C.F.R. § 416.920c(c)(5), emphasizing her familiarity with the SSA's evidentiary

requirements.  It would be better for an ALJ to state explicitly the degree to which he found a medical opinion from a medical source persuasive.

### *The ALJ's Hypothetical Question Improperly Stated Mr. Works's RFC*

For a vocational expert's testimony "to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002).  An ALJ does not have to "include findings in the hypothetical that the ALJ [has] properly rejected as unsupported." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  "The hypothetical need only include the claimant's impairments, not each and every symptom of the claimant." *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1270 (11th Cir. 2007).

In his brief, Mr. Works argues that the hypothetical question on which the VE relied did not accurately state Mr. Works's residual functional capacity because "[t]he hypothetical question assumed [Mr. Works] could perform medium work." (Doc. 9, p. 22). Again, medium work is defined as the ability to lift and/or carry 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  (Doc. 7-3, p. 21); 20 C.F.R. § 416.967(c).  This medium work determination is contrary to the medical evidence in the record, particularly the non-examining opinions on which the ALJ relied.  Dr. Hogan stated that Mr. Works could occasionally lift 20 pounds and frequently lift 10 pounds.  (Doc. 7-4, p. 12).  The

ALJ specifically cites this determination in his analysis.  (Doc. 7-3, p. 25).  The ALJ presumably found Dr. Hogan's conclusion persuasive because he found her opinion "consistent with the entire record, including treatment and evaluations from all sources at the time of adjudication."  But lifting 20 pounds and 10 pounds falls under the light work capacity, not the medium work capacity.  *See* 20 C.F.R. § 416.967(b)-(c).  In fact, the initial disability determination explanation prepared by Andrica Haynes and Drs. Hogan and Blackmon states that Mr. Works's work capacity is for light work, not medium work.  (Doc. 7-4, p. 17).

The ALJ appears to have substituted his own opinion for that of Dr. Hogan, and the ALJ failed to explain the medium work RFC, providing only a passing reference to Mr. Works's foot injury near the end of that section of his opinion.  In response to the ALJ's hypothetical question, the VE identified only medium work jobs.  Dr. Hogan recommended as representative occupations jobs that are in the light or sedentary work categories.

Thus, the ALJ's opinion is not based on substantial evidence because the ALJ improperly adopted a medium work RFC and used the RFC to obtain testimony from the VE that is inconsistent with the evidence in the record, evidence that the ALJ credited because Dr. Hogan is "familiar with our disability programs and their evidentiary requirements."

### *Additional Observations for Further Administrative Proceedings*

The Court notes that Dr. Blackmon opined that Mr. Works "would be expected to miss 1-2 days of work per month due to irritable mood," (Doc. 7-4, p. 15), the ALJ found Dr. Blackmon's opinion persuasive, (Doc. 7-3, p. 24), and the VE testified that Mr. Works could miss only one day per month for the medium work jobs she identified, (Doc. 7-3, p. 64).

In discussing the paragraph B criteria concerning Mr. Works, the ALJ found that Mr. Works had moderate limitation in interacting with others because he lived with his family and was cooperative with health care workers. (Doc. 7-3, p. 21). With respect to Mr. Works's living arrangements, the ALJ omitted from his analysis the fact that, at the time of his administrative hearing, Mr. Works was facing a domestic violence charge based on an interaction with his daughter. That charge bears on Mr. Works's ability to interact with family members.

As for the predictive value of Mr. Works's interactions with health care workers, according to his medical records, Mr. Works sought medical treatment 12 times in a seven-year period. As the ALJ acknowledged, on one occasion, Mr. Works reported to an emergency room but left before physicians could examine him. (Doc. 7-3, p. 23). Mr. Works had four mental health sessions in 2014. There is no evidence of Mr. Works spending more than a couple of hours with a particular health

care worker.  The ALJ did not explain how he extrapolated from these very limited interactions to sustained interactions such as interactions with co-workers.

## Conclusion

For the reasons discussed above, the Court remands this matter to the ALJ for further proceedings consistent with this opinion.  The Court will enter a final order separately.

**DONE** and **ORDERED** this February 23, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE